155 F.3d 572
 42 Cont.Cas.Fed. (CCH) P 77,322
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
LOCKHEED MARTIN CORPORATION, Appellant,
v.
Robert M. WALKER, Acting Secretary of the Army, Appellee.
 No. 98-1046.
June 24, 1998.
 
 Before NEWMAN, Circuit Judge, SKELTON, Senior Circuit Judge, and LOURIE, Circuit Judge.
 DECISION
 LOURIE, Circuit Judge.
 
 
 1
 Lockheed Martin Corporation appeals from the final decision of the Armed Services Board of Contract Appeals denying its claim for an equitable adjustment in its production contract with the government. Loral Aerospace Corp., ASBCA Nos. 46373, 47388, 48649, 97-2 BC p 29,128 (Jul. 22, 1997). Because Lockheed has not shown that the Board misconstrued the contract or that the Board's decision was not supported by substantial evidence, we affirm.
 
 DISCUSSION
 
 2
 Lockheed[1] entered into a contract with the government to produce missile guidance sections. The contract contained a Preproduction and Production Evaluation Requirements (PPE) clause, the intent of which is set forth in introductory paragraph (a), which states in relevant part:
 
 
 3
 This preproduction evaluation clause is intended to
 
 
 4
 (i) identify the problem of possible technical data deficiencies[;]
 
 
 5
 (ii) provide for the contractor[']s responsibility to review the Technical Data Package[2 [TDP] to identify and determine corrections of these deficiencies necessary to permit quantity production;
 
 
 6
 (iii) require reporting of such deficiencies and corrections to the government; and
 
 
 7
 (iv) to provide that the identification of such deficiencies and the necessary correction thereof shall not be cause under this contract for any price increase or revision in the delivery schedule.
 
 
 8
 (paragraphing and emphasis added). The introductory paragraph concludes that "[t]his clause is not intended to place upon the contractor any design responsibility under this contract except as provided herein." (emphasis added).
 
 
 9
 Paragraph (b) in the PPE defines that clause's scope, and specifies that:
 
 
 10
 Prior to, or in conjunction with [pre-production planning], and throughout the production phases of the contract, the contractor shall perform a detailed evaluation of all technical data associated with this contract. Such evaluation shall include ... analysis, identification, and recommended correction of any deficiencies in such data which the contractor considers necessary to assure that:
 
 
 11
 (1) The contract items ... can be produced, fabricated, assembled, and operated in complete accordance with the requirements of this contract and such technical data, corrected as required by this clause....
 
 
 12
 (2) The PPE clause shall provide for the complete resolution of deficiencies which:
 
 
 13
 (a) may have been overlooked during the development program such as typographical errors, and including those associated with conflicts of technical data within the TDP, and including completeness, correctness and clarity of the TDP.
 
 
 14
 (b) are attributable to tolerance stackup and no-fit dimension conditions.
 
 
 15
 ....
 
 
 16
 (l) are associated with increasing the percentage yield or rate of production to meet quantity and schedule requirements specified within this contract.
 
 
 17
 The parties agree that the PPE clause transferred to Lockheed the risk of identifying and correcting the deficiencies listed in paragraph (b)(2). The issue in this case is what that paragraph means.
 
 
 18
 After production was undertaken, it became clear that the TDP contained certain design deficiencies. As a result, the sections produced by Lockheed performed poorly and were of very low yield. Lockheed alleges that it spent an extra $25 million overcoming certain of these design deficiencies (14 in all) during production, and sought price increases therefor. After unsuccessfully requesting that the contracting officer approve this sum as an equitable adjustment, Lockheed appealed to the Board.
 
 
 19
 The Board denied Lockheed's claim, finding that each asserted deficiency was covered by the PPE clause, and that the risk of overcoming such deficiencies therefore rested upon Lockheed. Specifically, the Board determined that the asserted deficiencies were covered by various combinations of clauses (b)(2)(a), (b) and (l).[3] See slip op. at 8-14. The Board also rejected parol evidence proffered by Lockheed that purported to show that the parties intended the contract to be "build to print," apparently meaning that Lockheed could blindly follow the TDP without liability for poor product performance, and accordingly that the PPE clause covered only "minor" TDP errors and not "major" design changes. Id. at 18. The Board also found relevant that Lockheed considered the risk shifted to it by the PPE clause to be significant. Id. at 18-19.
 
 
 20
 Lockheed appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) (1994). The standard under which we review a decision of the Board is dictated by the Contract Disputes Act, which provides in relevant part:
 
 
 21
 the decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.
 
 
 22
 41 U.S.C. § 609(b) (1994). We review questions of law, including contract interpretation, de novo. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997 (Fed.Cir.1996). Notwithstanding this lack of deference concerning questions of law, "legal interpretations by tribunals having expertise are helpful to us, even if not compelling." Erickson Air Crane Co. v. United States, 731 F.2d 810, 814 (Fed.Cir.1984).
 
 
 23
 Lockheed argues that the Board misconstrued the scope of the PPE clause. Lockheed asserts that the PPE clause transferred to it responsibility for resolving only the limited listed deficiencies of paragraph (b)(2), but that the Board's overly-broad construction of the scope of those provisions, particularly clauses (b)(2)(a) and (l), improperly transferred all design responsibility to it. Lockheed also asserts that the Board erred in failing to consider the substance of the negotiations which led to the execution of the contract, evidence which Lockheed submits is indicative of the parties' intent to limit Lockheed's liability for correcting design deficiencies.
 
 
 24
 The government responds that the Board properly construed the PPE clause, and that substantial evidence supports the Board's conclusion that the asserted deficiencies fell within the scope of paragraph (b)(2). The government argues further that the evidence extrinsic to the contract is consistent with the scope and effect of the PPE clause as interpreted by the Board.
 
 
 25
 We disagree with Lockheed that the Board misconstrued the meaning of the provisions of paragraph (b)(2). As the Board recognized, the clear language of clause (b)(2)(a) transferred to Lockheed responsibility for deficiencies "associated with conflicts of the technical data within the TDP, and including completeness, correctness and clarity of the TDP." The Board then found that certain of the asserted deficiencies pertained to incomplete or incorrect aspects of the TDP as recited in this clause. Likewise, clause (b)(2)(l) transferred to Lockheed responsibility for other deficiencies "associated with increasing the percent yield or rate of production." Again, the Board found that these deficiencies were yield-related. Substantial evidence supports the Board's findings. We disagree with Lockheed's contention that the Board's treatment of these two clauses effectively transferred to Lockheed responsibility for all design-related deficiencies. The Board did not treat any clause as a "catch-all" for all production-related design problems. Instead, the Board thoroughly determined that the facts underlying each asserted deficiency were within the scope of and hence governed by one or another provisions of the contract: (b)(2)(a), (b)(2)(l), both, or neither, depending upon the circumstances.
 
 
 26
 Our conclusion that the Board did not err is not changed by the extrinsic evidence surrounding the formation of the contract. Lockheed asserts that the Board failed to consider evidence that Lockheed entered into the contract at a reduced price upon receiving assurances from the government that the contract would be "build to print" and accordingly that the contract does not transfer responsibility to Lockheed for "major design issues." However, Lockheed's argument is at odds with the express wording of the PPE clause, which transfers to Lockheed responsibility for the design deficiencies listed in paragraph (b)(2), be they "major" or "minor." Lockheed does not take issue with the Board's finding that the contract was fully integrated, and indeed that the contract contains an integration clause.[4] Accordingly, Lockheed is incorrect in asserting that this extrinsic evidence modifies the otherwise clear language in the PPE clause. See McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434 (Fed.Cir.1996) (noting that when a contract is fully integrated, "the parol evidence rule prohibits the use of extrinsic evidence to add to or to modify its terms.").
 
 
 27
 If extrinsic evidence were to be considered, the government's evidence in fact shows that, prior to this litigation, Lockheed viewed the contract in the same way that the government now does. It understood that the PPE clause as written posed a "major risk" to it, but that it was willing to take that risk in order to secure the contract, which it viewed as "vital" to continuing its relationship with the government. That this risk subsequently materialized may be unfortunate, but it is one that Lockheed chose to take and for which no remedy is available.
 
 
 28
 We have considered Lockheed's remaining arguments, but find them to be unpersuasive. Finding no error in the Board's decision, we affirm.
 
 
 
 [1]
 Lockheed is actually the successor to several companies that were involved in the activities that gave rise to the instant action. For simplicity's sake, we refer to all of those companies as "Lockheed."
 
 
 [2]
 Generally, the TDP provided the production specifications that Lockheed was to follow during performance of the production contract. The TDP was the product of an earlier design contract between Lockheed and the Army
 
 
 [3]
 We note that one of the deficiencies for which Lockheed seeks compensation (viz., Z8K Module Deviation), was rejected by the Board on the basis that that deficiency was the subject of a bilateral modification. See slip op. at 9-10. Because Lockheed does not assert that this ground of rejection was in error, we need not address it
 
 
 [4]
 The integration clause reads as follows: "The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein." See slip op. at 6